IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK G. GALLEY, II, | ) | Case No. 1:20-cv-1411 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Patrick G. Galley, II ("Galley"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards by neglecting to include any explanation why Galley's skin impairment did not *medically equal* Listing 8.05 and that error was not harmless, I recommend that the Commissioner's final decision denying Galley's applications for DIB and SSI be VACATED and that Galley's case be REMANDED for further consideration.

## I.    Procedural History

On July 13, 2017, Galley applied for DIB and SSI.  (Tr. 302-18).  Galley alleged that he became disabled on January 1, 2016, due to: 1. "Non-[H]odgkin[] Cutaneous T-Cell Lymphoma; [and] 2. Generalized Anxiety Disorder."  (Tr. 302, 309, 324, 333).  The Social Security

Administration denied Galley's applications initially and upon reconsideration.  (Tr. 137-62, 165-90).  He requested an administrative hearing.  (Tr. 208-09).  ALJ Eric Westley heard Galley's case on March 27, 2019 and denied the claim in a May 15, 2019 decision.  (Tr. 13-31, 38-120).  On April 27, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On June 26, 2020, Galley filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Galley was born on March 22, 1996 and was 19 years old on the alleged onset date.  (Tr. 302, 309, 324).  Galley was 21 years old on the date last insured.  He completed 12th grade in June 2014, and he had vocational training in carpentry.  (Tr. 334).  Galey had past work as a cafeteria server, but the ALJ determined that it did not meet the definition of past relevant work.  (Tr. 29, 334).

### B.     Relevant Medical Evidence

The ALJ's decision summarized the relevant medical evidence.  (Tr. 16-31).  Galley does not challenge the ALJ's summary of the medical evidence or submit new evidence.  *See generally* ECF Doc. 14.  And an independent review does not reveal any material inconsistencies (other than those discussed below) between the ALJ's summary of the facts and the record before this Court.  *Compare* (Tr. 16-31), *with* (Tr. 377-1148).  Thus, this court adopts and incorporates by reference the ALJ's summary of the medical evidence[1]:

---

[1] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd* by 139 S. Ct. 1148 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

Records from Allergy/Immunology Associates reflect[] that the claimant has a history of cutaneous T-cell lymphoma (CTCL) and he presented for a rhinitis evaluation (Exhibit 3F [(Tr. 418-52)]).  Since July [2015], he complained of worsening nasal and sinus congestion, postnasal drainage, and sneezing, which is worse in the morning and presents indoors and outdoors. . . . Regarding his [CTCL], he described a scaling of back of therapy, but there has been a flare of disease associated with this.  He is intolerant of Vitamin A therapy due to increased cerebrospinal fluid (CSF) pressure.  Examination noted he was in no acute distress, he was comfortable, and he was oriented. . . . He had diffuse large eczematous patches located on back, neck, trunk and lower extremities.  He was assessed with allergic urticaria, mild intermittent asthma, perennial allergic rhinitis due to animal hair and dander.  Right ventral hand skin biopsy on July 8, 2016 showed atypical lymphocytic infiltrate with increased CD30-positive cells (Exhibit 8F p. 18 [Tr. 698]).

Records from Kevin Cooper, M.D., reflect the claimant started having rashes at age 8 and he was diagnosed with CTCL on biopsy in June 2013 (Exhibits 4F and 6F [Tr. 453-563, 621-56]).  He reported itching associated with his condition as a 3 on a scale of 0-10.  Examination noted he was in no apparent distress and he appeared in good general health.  There was no liver or spleen enlargements.  The lymph node beds were examined bilaterally and there was palpable adenopathy noted.  He was alert and oriented to person, place, time and context.  He was pleasant and cooperative.  Total body skin examination was performed and he had large erythematous and slight violaceous patches on neck, trunk, and thi[ghs].  He was diagnosed with mycosis fungoides, unspecified site, primary cutaneous CD30-positive T-cell proliferations and long-term (current) use of other medications.  The claimant was currently on methotrexate with about 50% skin improvement since initial presentation.  He appears to have achieved partial remission in November 2016, but he may need longer use of current treatment or additional medication to achieve full remission.

Dr. Cooper noted on June 14, 2017 that the claimant was status post topical Targretin (last used April 2017 and stopped due to development of increased intraocular (IO) pressure and concern for recurrence of pseudotumor cerebri) and Methotrexate (last taken in April 2017), stopped in preparation to enroll in a clinical trial (Exhibit 5F [Tr. 564-620]).  Despite having stopped the topical Targretin, he continued to have increase in IO pressure and he was currently undergoing work up to determine the cause.  Because of this, he is not currently a candidate for the Clinical Trial.  In a previous visit, while on Methotrexate, he was noted to have transaminitis . . . and thrombocytopenia . . . .  Recent laboratory from June 6, 2017 showed resolution of transaminitis.  His platelets were clumped due to his history of antibodies against EDTA.  He was doing well and he denied any issues or concerns.  Total body skin examination noted large scaly, somewhat erythematous patches covering about 30%.  He was diagnosed with mycosis fungoides unspecified site, long term/medications, primary cutaneous CD30-positive T-cell proliferations, and other secondary thrombocytopenia.

3

. . . Michael Morgan, M.D., evaluated the claimant on July 28, 2017 (Exhibit 9F [Tr. 706-47]).  The claimant has a history of CTCL treated with (UV) therapy and previously Bexarotene orally, now topically, along with allergies and asthma presented for follow-up for secondary pseudotumor cerebri with recent exacerbation of symptoms while on topical Bexarotene, now stopped.  He continues off systemic medications for CTCL at the moment, but he has continued topical treatment. . . . The impression was pseudotumor cerebri – improving, CTCL – stable, papilledema of both eyes – improving, blepharitis – stable, and myopia with astigmatism – stable.  The claimant had improvement of symptoms and signs of elevated intracranial pressure while off exacerbating medications and acetazolamide.

On October 18, 2017, the claimant was seen for follow-up of his asthma (Exhibit 12F [Tr. 764-69]). . . . Skin examination noted no rash, lesions, purpura or petechiae.  He was diagnosed with mild persistent asthma and allergic urticaria.

Dr. Cooper noted on October 24, 2017 that the claimant was doing a little better (Exhibit 11F [Tr. 756-63]).  Eucrissa [*sic*] seemed to be working fairly well.  The claimant was to continue with chlorine treatment and be in the pool three times a week.  It was noted the claimant was using Eucrissa [*sic*] topically and this may have contributed to his weight loss due to his increased level of systemic absorption of topical medications. . . . The claimant reported that his facial and body hair was starting to grow back since starting the Eucrissa [*sic*]and Dr. Cooper noted that it was a likely sing [*sic*] that his CTCL was improving.  He had an ulceration on his right hip.  Total body skin examination noted generalized distribution of numerous pink patches and thin plaques with overlying scale (approximately 30% BSA).  The patches on the lower back were a deeper read [*sic*].  The right hip had a shallow ulcer with partial scar and overlying eschar.  He was diagnosed with mycosis fungoides and his CTCL appeared moderately well-controlled on Eucrissa [*sic*] and chlorine therapy.

. . . Dr. Cooper examined the claimant on February 6, 2018 (Exhibit 16F [Tr. 790-807]).  Examination involving the face, back, chest, upper abdomen, buttocks and thighs noted numerous pink plaques with overlying scale approximately 35% BSA.  Examination involving left mid back had a 5 x 4 mm bright pink place.  Right lateral breast had a 9 x 7 mm ill-defined brown macule with focally dark brown-black pigment.  Examination involving the posterior neck was 3 x 5 cm subcutaneous mass.  Punch biopsy was performed on mid back and right breast.  He was diagnosed with primary cutaneous CD30-positive-T-cell proliferations, mycosis fungoides, neoplasm of uncertain behavior of skin on left mid back and right breast, and benign lipomatous neoplasm of skin and subcutaneous tissue of head, face and neck.

Pathology results of February 8, 2018 noted skin, left mid back, punch biopsy showed inflamed hemangioma, preset on the peripheral margin (Exhibit 15F, p. 6

4

[Tr. 788]).  Skin right breast, punch biopsy showed superficial lymphocytic infiltrate with pigment incontinence.

Dr. Morgan noted on February 20, 2018 that the claimant had stopped taking the acetazolamide and he had not experienced any headaches (Exhibit 17F [Tr. 808-94]). . . .The claimant appears to be in remission from secondary pseudotumor cerebri.  The impression was pseudotumor cerebri – improving, CTCL – stable, papilledema of both eyes – improving, blepharitis – stable, and myopia with astigmatism – stable.

Aditi Parikh, M.D., evaluated claimant on March 23, 2018 (Exhibit 18F [Tr. 895-900]).  Examination noted he was in no acute distress. . . . Upper extremity examination noted no deformity, normal range of motion and normal digits.  Skin findings include rough erythematous patches on face, neck, torso and back.  He was diagnosed with CTCL.

It was noted on August 27, 2018 that the claimant was at least 75% compliant with his asthma control medications (Exhibit 21F, p.7 [Tr. 1001]). . . . He was assessed with allergic rhinitis due to animal hair and dander, mild intermittent asthma, allergic urticaria and mild persistent asthma that is stable and controlled.

Dr. Cooper examined the claimant on August 31, 2018 (Exhibit 22F [Tr. 1008-16]).  Examination of the back, chest, abdomen, buttocks and thighs noted dry, scaly, erythematous patches and plaques with fine wrinkling.  Examination of left thing [*sic*] and right back noted firm pea-sized to smaller nodules.  He was diagnosed with mycosis fungoides, other fatigue and rash and other nonspecific skin eruption of the left thigh and right back.

Margaret Mann, M.D., noted on October 2, 2018 that the claimant's basic cell carcinoma (BCC) of the right upper back was stable (Exhibit 24F [Tr. 1041-52]).  Examination noted he had a pink scar that was consistent with the biopsy site.  The lesion was skin cancer.  It was locally aggressive but had a very low to non-existent risk of spreading.  The condition was associated with sun exposure.

On January 28, 2019 the claimant stated that his asthma was well controlled (Exhibit 29F [Tr. 1098-1104]). . . . Skin examination noted diffuse dry flaky red/purple skin lesions on chest and back.  He was diagnosed with mild persistent asthma, allergic urticaria, perennial allergic rhinitis, mild intermittent asthma, and allergic rhinitis due to animal hair and dander.

Dr. Cooper noted on January 29, 2019 that the claimant presented for biopsy of a new nodule on his back (Exhibit 30F [Tr. 1105-22]).  He had a similar nodule in August 2018 that was biopsied and showed a bas[a]loid neoplas[m] consistent with possible desmoplastic trichoepithelioma vs. BCC.  Examination of the right mid back showed 3mm flesh color nodule under a CTCL patch.  He underwent a

5

punch biopsy.  The claimant was diagnosed with CTCL and neoplasm of
uncertain behavior, unspecified.

(Tr. 23-27).

### C.      Relevant Opinion Evidence

Galley focuses his challenge on the ALJ's findings at Step Three of the sequential

evaluation process, including the ALJ's reliance on certain medical opinion evidence.  Thus,

notwithstanding the court's adoption of the ALJ's summary of the medical evidence, the court

will separately discuss the medical opinion evidence.

### 1.      State Agency Consultants

On August 21, 2017, state agency consultant Gary Hinzman, MD, evaluated Galley's

physical capacity based on a review of the medical record and found that he had the residual

functional capacity ("RFC") to perform a range of medium work.  (Tr. 144-47).  In doing so, he

considered Listing 13.05 (Lymphoma), but found that Galley did not meet it because "[a] variety

of therapies have restricted the spread, and there is no evidence of advanced tumor formation.

Currently characterized as stage IB.  Last treated with Methotrexate 04/2017.  Also treated with

topical and UV therapies.  CSF consistently shows scattered small lymphocytes."  (Tr. 145-46).

On December 6, 2017, Obiaghanwa Ugbana, MD, concurred with Dr. Hinzman's

opinion.  (Tr. 172-76).  Dr. Ugbana additionally explained: "PMH pos for Non-Hodgkin's

Lymphoma of skin.  Doing chlorine tx 3x/weekly.  DX: Mycosis fungoides unspecified site.  Pt

doing a little better.  Eucrissa [sic] seems to be working fairly well."  (Tr. 174).

### 2.      Treating Physician Opinion – Kevin Cooper, MD

On January 22, 2019, treating physician Kevin Cooper, MD, completed a "Medical

Statement Regarding Cancer," providing an opinion about Galley's cancer from "1/1/16 through

the present."  (Tr. 1095).  Dr. Cooper stated that: (1) Galley had cutaneous T-cell lymphoma

("CTCL"); (2) multiple biopsies had been performed on Galley; (3) the residual effect of the biopsies was skin scars; (4) future skin biopsies were contemplated; (5) Galley had not undergone radiation treatment; (6) Galley had, and would continue to require, topical chemotherapy until the therapy "does not provide benefit;" and (7) Galley "has never achieved remission."  (Tr. 1095).

Dr. Cooper also completed an "Off-Task/Absenteeism Questionnaire," discussing the effect of Galley's symptoms and medication side effects on his physical limitations.  (Tr. 1096). Dr. Cooper sated that Galley would be off-task at least 20% of the time because of his "severe extensive skin lesions due to lymphoma and weakness and fatigue due to disease treatment." (Tr. 1096).

### D.    Relevant Testimonial Evidence

Medical expert Robert Sklaroff, MD, testified at the ALJ hearing.  (Tr. 63-97).  Dr. Sklaroff said that Galley did not meet or equal the criteria for Listing 13.05A2 because there was no evidence that his treatment failed.  (Tr. 74).  While there was evidence that Galley changed treatment several times, there was no indication that the cause for changing treatment was that one or another treatment had failed.  (Tr. 79).  Instead, the treatments were changed due to concerns over side effects.  (Tr. 93).  The record showed that the treatments given were working because, if they had not, "you'd have the disease busting out all over" – become reactive in other areas of the body – or the disease would be "recurrent," "residual," or "metastatic."  (Tr. 76-77). Galley's lymphoma "seem[ed]" stable because there was no "recurrent residual metastatic disease" observed in the biopsies.  (Tr. 93-94).  In assessing whether Listing 13.05 applied, Dr. Sklaroff looked in the record for evidence of: (1) relapse; and (2) whether Galley's post-treatment symptoms could be ascribed to his CTCL.  (Tr. 64-65).

In support of his opinion, Dr. Sklaroff testified that he considered Galley's ophthalmological records from 2017 to get a snapshot of Galley's status at the time.  (Tr. 68-70) (citing Exhibit 9F (Tr. 706-47)).  While the records were "written from the ophthalmologic perspective," Dr. Sklaroff indicated that their contents were "applicable systemically."  (Tr. 69). Dr. Sklaroff also considered hospital records showing that in 2015 he was receiving ultraviolet ("UV") light therapy and oral and topical medication, yet his later records showed that he was "doing well," seemingly in remission.  (Tr. 70) (citing Exhibit 19F (Tr. 901-16)).  Galley's treating physician records likewise showed no evidence of relapse in his skin examinations.  (Tr. 71) (citing Exhibit 11F (Tr. 756-63)).  Galley's more recent January 2019 records showed him to be in good general health with a bare observation of a three-millimeter nodule under a patch, without context.  (Tr. 73) (citing Exhibit 28F (Tr. 1094-97)).

Dr. Sklaroff further testified that he did not evaluate Listing 8.05 because "that's more for people who don't also have a much more specific diagnosis such as the problem that [Galley] has with . . . mycosis."  (Tr. 89).  Even though Galley had extensive skin lesions persisting for at least three months, Galley did not meet Listing 8.05 because that listing concerned "dermatitis." (Tr. 90).  Galley's skin problems were a "secondary phenomenon" to his mycosis fungoides. (Tr. 63, 95).  The following exchange then ensued between the ALJ and Dr. Sklaroff:

> **Q:** If you can assume that there is a diagnosis of dermatitis in the record, does the Claimant otherwise meet or equal that particular listing?
>
> **A:** It sounds that way.  It sounds like it's a persistent problem all the way through, except if it's the primary diagnosis versus . . . [a] secondary phenomenon.

(Tr. 94).

III.     **The ALJ's Decision**

On May 15, 2019, the ALJ issued a written decision denying Galley's claims.  (Tr. 16-31).  The ALJ made the following paraphrased findings relevant to Galley's arguments in this case:

3.  Galley had the severe impairments of lymphoma and asthma.  (Tr. 19-21).

4.  Galley had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments.  (Tr. 21).

No treating or examining physician indicated findings that would satisfy the severity of any listed impairment.  The record did not establish the medical signs, symptoms, laboratory findings, or degree of functional limitation required to meet or equal the criteria of any listed impairment.  And no accepted medical source designated to make equivalency findings concluded that Galley's impairments medically equaled a listed impairment.  In concluding that Galley had no impairment or combination of impairments that met or equaled the listings, the ALJ additionally considered the opinion of the state agency consultants.  The ALJ considered listings 8.05 and 13.05 in reaching this finding.  (Tr. 21).

"The undersigned considered the listing 8.05, the listing for dermatitis (for example, psoriasis, dyshidrosis, atopic dermatitis, exfoliative dermatitis, allergic contact dermatitis[]).  In order to meet this listing, the claimant must have dermatitis with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed.  The claimant fails to meet this listing."  (Tr. 21).

"The undersigned considered listing 13.05, the listing for lymphoma (including mycosis fungoides, but excluding T-cell lymphoblastic lymphoma).  In order to meet this slight [sic], the lymphoma must (A) non-Hodgkin lymphoma as described in 1 or 2: (1) aggressive lymphoma (including diffuse large B-cell lymphoma) persistent or recurrent following initial anticancer therapy or (2) indolent lymphoma (including mycosis fungoides and follicular small cleaved cell) requiring initiation of more than one (single mode or multimodal) anticancer treatment regimen within a period of 12 consecutive months.  Consider under a disability from at least the date of the initiation of the therapy that failed within 12 months.  Or, (B) Hodgkin lymphoma with failure to achieve clinically complete remission, or recurrent lymphoma within 12 months of completing initial anticancer therapy.  Or, (C) with bone marrow or stem cell transplantation.  Consider under a disability at least 12 months from the date of transplantation.  Thereafter, evaluate any residual impairment(s) under the criteria for the affected body system.  Or, (D) mantel cell lymphoma.  The claimant does not meet this listing."  (Tr. 21-22).

9

5.  Galley has the [RFC] to perform medium work, except he can frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; and must avoid all exposure to unprotected heights, moving machinery, and commercial driving.  (Tr. 22).

Galley's impairments could be expected to produce some discomfort and functional limitations, but the objective evidence did not support his contentions regarding the severity, chronicity, and/or frequency of his symptoms.  Further, his statements regarding his impairments and their impact on his ability to work were not entirely consistent with the objective medical evidence.  (Tr. 23).

The ALJ found "very persuasive" the opinions of the state agency consultants regarding Galley's exertional limitations.  (Tr. 27-28).

The ALJ likewise found "very persuasive" Dr. Sklaroff's opinion, including his opinion that Galley did not meet Listings 8.05 and 13.05, "because [Dr. Sklaroff] had the opportunity to review the entire record, he had the benefit of the claimant's testimony, he is a Board-certified physician and his opinion is consistent with the evidence."  (Tr. 28).

6.  Galley had no past relevant work.  (Tr. 29).

7.  Galley was a "younger individual" (18-49 years old) because he was 19 years old on the alleged onset date.  (Tr. 29).

Based on these findings –  and the testimony from a vocational expert that an individual with Galley's RFC, age, and experience could work in the representative occupations of linen room attendant, bagger, and patient transporter – the ALJ found that Galley was not disabled from January 1, 2016 through the date of his decision.  (Tr. 29-31).

IV.   **Law & Analysis**

A.    **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.*

11

*Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).

### B.      Step Three – Listing for Dermatitis

Galley argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating whether his skin impairments met or medically equaled Listing 8.05.  ECF Doc. 14 at 5-8.  Galley asserts that the ALJ gave an inadequate, "boilerplate explanation" for why the listing was not met, necessitating a remand, because the record raised a "substantial question" as to whether the listing was met.  ECF Doc. 14 at 5, 7.  Galley argues further that the ALJ's finding that his skin impairments did not meet the

requirements of Listing 8.05 was not supported by substantial evidence because: (1) contrary to the ALJ's characterization of Dr. Sklaroff's testimony, Dr. Sklaroff testified that it appeared that his impairment met or equaled the listing; (2) he carried dermatitis diagnoses through the relevant period; and (3) he continued to have extensive skin lesions covering up to 50% of his body during the relevant period. ECF Doc. 14 at 7-8.

Without addressing the adequacy of the ALJ's explanation, the Commissioner responds that substantial evidence supports the ALJ's decision that Galley did not meet Listing 8.05 because the record did not show that Galley's dermatitis caused extensive skin lesions. ECF Doc. 16 at 5-6. The Commissioner argues that, although Galley's biopsies showed dermatitis, the record established that his skin issues were not caused by his dermatitis, but rather by his CTCL. ECF Doc. 16 at 6. The Commissioner notes that there was no discussion of Galley's dermatitis after his CTCL diagnosis and the oncologist's concern for "dermatitis side effects" of his medication treatment did not mean that he had an existing dermatitis diagnosis. ECF Doc. 16 at 6.

Galley replies that the ALJ's conclusion that his skin impairments did not meet Listing 8.05 "was not accompanied by the required attempt to compare the requirements of the listings to the underlying evidence of record." ECF Doc. 17 at 2. He contends that the ALJ's discussion of his body examinations appeared to support a finding that his dermatitis met the listing. ECF Doc. 17 at 2-3. He also argues that it was possible for him to have both skin cancer and dermatitis at the same time, and the record showed that his dermatitis predated his CTCL. ECF Doc. 17 at 3.

At Step Three, the clamant has the burden to prove that he has an impairment or combination of impairments that meet or medically equal a listed impairment. *Foster v. Halter*,

279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). The claimant is conclusively presumed disabled if he meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step. 20 C.F.R. § 1520(d)–(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). To "meet" a listing, "the claimant must show that his impairment [satisfies] all of the requirement for a listed impairment." *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 787-88 (N.D. Ohio Sept. 10, 2002); 20 C.F.R. § 1525(c)(3). To "medically equal" a listing, the claimant's impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In determining whether a claimant's impairment meets or medically equals a listing, a medical expert's opinion testimony regarding listing criteria may be substantial evidence supporting an ALJ's listing analysis when that medical opinion is based upon (and consistent with) the objective medical evidence in the record. SSR 17-2p, 2017 SSR LEXIS 2, at *5 (Mar. 27, 2017); *see*, *e.g.*, *Atterberry v. Sec'y of Health & Hum. Servs.*, 871 F.2d 567, 570 (6th Cir. 1989); *cf.* 20 C.F.R. § 404.1520c (an ALJ may find a medical opinion persuasive if it is consistent with objective medical evidence).

"If . . . the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation marks and alterations omitted). While the burden is on the claimant to establish that he meets or medically equals a listed impairment, the ALJ must: (1) evaluate the evidence; (2) compare the evidence to the relevant listing; and (3) "give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). A Step Three analysis that fails to comply with *Reynolds* will result in a remand, *Brock v. Colvin*, 125 F. Supp. 3d 671, 673 (N.D. Ohio Aug. 31,

2015), unless the claimant can show that his impairments met or medically equaled a listed impairment, *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

The ALJ failed to apply proper legal standards in determining whether Galley's skin impairments met or *medically equaled* Listing 8.05.  *See* 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  As a whole, the ALJ's decision fell far short of satisfying the requirements of *Reynolds*. 424 F. App'x at 416.  Although the ALJ said he considered the medical and opinion evidence and articulated the requirements for Listing 8.05, the ALJ's discussion did not include any comparison of the evidence to the criteria of the Listing or any explanation sufficient for meaningful review of the ALJ's finding that Galley did not meet the listing.[2]  *Reynolds*, 424 F. App'x at 416; (Tr. 21).  More egregious is the complete absence of any discussion or finding regarding whether Galley had a skin condition that *medically equaled* Listing 8.05.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525(c)(5), 404.1526(b); *see also* SSR 17-2p, 2017 SSR LEXIS 2, at *4 (explaining that even when an ALJ finds a claimant does not *meet* a listing, the ALJ must then consider whether the claimant has a condition that *medically equals* the listing); *Minor v. Colvin*, No. 1:15-cv-1017, 2016 LEXIS 101846 at *13 (S.D. Ind. July 11, 2016) ("It does not necessarily follow from a claimant's failure to *meet* a listing that the claimant also fails to *medically equal* the listing." (emphasis in original)).

The ALJ's omissions cannot be overlooked as harmless.  Dr. Sklaroff – the only expert to give an opinion on whether a listing was met and whose testimony the ALJ's found "very

---

[2] The ALJ did note, in evaluating opinion evidence at Step Four, that "Dr. Sklaroff also reviewed Listing 8.05 for skin lesions and the claimant does not meet or equal this listing."  (Tr. 28).  But absent from this conclusory statement is any discussion of medical findings regarding the duration or severity of Galley's skin condition that would support such a conclusion.  And, as discussed further below, the ALJ's conclusory summary of Dr. Sklaroff's testimony does not appear to accurately reflect what Dr. Sklaroff said.  *Compare* (Tr. 28), *with* (Tr. 89-94) (indicating only that Galley did not *meet* Listing 8.05 because dermatitis was his primary diagnosis, but that his skin condition would have met Listing 8.05 if his primary diagnosis were dermatitis).

persuasive" – indicated that Galley did not *meet* Listing 8.05 only because dermatitis was not the primary cause for Galley's skin impairments.[3]  (Tr. 28, 89, 90, 94).  But he agreed that, had dermatitis been Galley's primary diagnosis, his skin condition would have met Listing 8.05.  (Tr. 94).  Implicitly, Dr. Sklaroff acknowledged that, although Galley's skin impairments did not strictly *meet* (arguably for lack of a dermatitis diagnosis) Listing 8.05, his skin condition *medically equaled* the severity and duration requirements of Listing 8.05.  *See* (Tr. 94).  Because there is evidence indicating that Galley's skin impairments are "at least equal in severity and duration to the criteria of [a] listed impairment," the ALJ's failure to confront this evidence, comply with the regulations, and provide the type of explanation contemplated in *Reynolds* was non-harmless error.  20 C.F.R. § 1526(a); *Forrest*, 591 F. App'x at 366; *Bowen*, 478 F.3d at 746; *Reynolds*, 424 F. App'x at 416.  Further, the ALJ's failure to provide an adequate explanation left the ALJ's decision without an accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.

Because the ALJ's discussion for why Listing 8.05 was not met or medically equaled was inadequate, I recommend that this matter be remanded so that the ALJ can conduct a Step Three analysis[4] consistent with *Reynolds*.

---

[3] I have found it necessary to draw inferences about what Dr. Sklaroff's opinions were.  I recognize our role is not to evaluate the weight of Dr. Sklaroff's testimony (as Galley urges us to do) but, instead, to simply take it as given.  I have made every effort to understand exactly what the Doctor's opinions were. But that was difficult, because Dr. Sklaroff's testimony was anything but clear, unless one favors rambling, thinking-out-loud narrative answers to questions.
[4] Galley has not raised a claim that the ALJ erred by failing to classify his dermatitis as a severe condition – or even discussing why it was non-severe – in his Step Two analysis.  As such, Galley has forfeited the ability to make that claim in this case.  *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517-18 (6th Cir. 2010).

### C.    Step Three – Listing for Lymphoma

Galley next argues that the ALJ failed to apply proper legal standards and reach a

decision supported by substantial evidence in evaluating whether his cancer met Listing 13.05.

ECF Doc. 14 at 8-11.  Galley argues that the ALJ did not address the requirements of Listing

13.05 and instead relied on Dr. Sklaroff's flawed opinion that he did not meet the listing.  ECF

Doc. 14 at 8-11.  Galley argues that evidence of a relapse (which he asserts was Dr. Sklaroff's

first reason in support of his opinion) was not required under Listing 13.05, and Dr. Sklaroff was

not free to interpret the listing to require more than it stated.  ECF Doc. 14 at 8-10.  Galley

argues that Dr. Sklaroff's second reason – that his condition appeared stable – was based on

ophthalmological records, which were irrelevant because he did not have eye cancer.  ECF Doc.

14 at 8-9.  And Dr. Sklaroff's stability determination was inconsistent with (i) Galley's

oncological records characterizing his cancer as persistent on May 30, 2018 and (ii) records of

his need for ongoing wound care.  ECF Doc. 14 at 9.  He argues that he met the listing because:

(1) he had mycosis fungoides; (2) his cancer required more than one anticancer treatment

regimen within a consecutive 12-month period (his 2016 UV light, methotrexate, and topical

chemotherapy treatments); and (3) the lack of remission was evidence that his treatment failed.

ECF Doc. 14 at 10-11.

The Commissioner responds that substantial evidence supported the ALJ's finding that

Galley's cancer did not meet or equal Listing 13.05 because the record showed that his CTCL

was in partial remission in March 2017 and was clinically stable in May 2018, such that the

treatments had not failed.  ECF Doc. 16 at 7-8.  For the same reasons, the Commissioner argues

that that the ALJ reasonably relied on Dr. Sklaroff's opinion in finding that Galley did not meet

Listing 13.05 because his observation that Galley's cancer was stable was consistent with the

record.  ECF Doc. 16 at 8.  The Commissioner argues that Dr. Sklaroff did not read into the

listing a relapse requirement; rather, he testified that Galley's condition had not worsened even

though he changed therapies over side-effect concerns.  ECF Doc. 16 at 8.  The reasons for

Galley's change in treatment, despite stability, the Commissioner argues, were relevant to

whether Listing 13.05 was met.  ECF Doc. 16 at 8-9.  The Commissioner further contends that

the ALJ's decision was supported by the consulting examiners' opinions, which, by not

addressing the listings, necessarily found that Galley's cancer did not equal Listing 13.05.  ECF

Doc. 16 at 9.

Galley replies that his oncologist characterized his CTCL as "persistent," and the

oncologist had only described a condition as "stable" in reference to Galley's benign lipoma.

ECF Doc. 17 at 4-5.[5]

Listing § 13.05 establishes the criteria for lymphoma.  20 C.F.R. pt. 404, Subpt. P, App. 1

§ 13.05.  The criteria for non-Hodgkin's lymphoma are:

> 1. Aggressive lymphoma (including diffuse large B-cell lymphoma) persistent or
> recurrent following initial anticancer therapy.
>
> 2. Indolent lymphoma (including mycosis fungoides and follicular small cleaved
> cell) requiring initiation of more than one (single mode or multimodal) anticancer
> treatment regimen within a period of 12 consecutive months.  Consider under a
> disability from at least the date of initiation of the treatment regimen that failed
> within 12 months.

---

[5] Galley is correct in this assertion.  The Commissioner's brief is flatly wrong in asserting that Galley's "oncologist found that his CTCL was clinically stable in May 2018" based on a citation to the medical evidence found on page 1016 of the transcript.  ECF Doc. 17 at 7.  That page indicates that Galley's "*benign lipomatous neoplasm*" of the skin (Tr. 1015) "seems to be clinically stable" and "asymptomatic at this time," (Tr. 1016).  That obviously is not a statement that his cancer was stable.  To the contrary, Galley's Mycosis fungoides was described as a "persisting disease," and the physician who wrote the note discussed whether Galley had a "genetic mutation" or might be in need of a "bone marrow transplant," terms that do not, on their face, connote a stable condition.  (Tr. 1015).  I don't know what the Commissioner was trying to accomplish by this erroneous record citation, but given my remand recommendation above, the issue of whether Galley's CTCL met or medically equaled Listing 13.05 can be revisited if Galley submits new or updated evidence.

20 C.F.R. pt. 404, Supt, P, App 1 § 13.05A.  The requirements of Listing § 13.05A2 will not be

met if the claimant's therapy treatment "is changed solely because [he] or [his] physician

chooses to change it and not because of a failure to achieve stability."  20 C.F.R. pt. 404, Supt, P,

App 1 § 13.00K1b.  As discussed above, an ALJ must: (1) evaluate the evidence; (2) compare

the evidence to the relevant listing; and (3) "give an explained conclusion, in order to facilitate

meaningful judicial review."  *Reynolds*, 424 F. App'x at 416.  And a medical expert's testimony

may be substantial evidence supporting an ALJ's decision as to whether a claimant's impairment

meets or medically equals a listed impairment.  SSR 17-2p, 2017 SSR LEXIS 2, at *5;

*Atterberry*, 871 F.2d at 570.

The ALJ applied proper legal standards in finding that Galley's lymphoma did not meet

or medically equal the severity criteria of Listing 13.05.  *See* 42 U.S.C. § 405(g); *Rogers*, 486

F.3d at 241.  The ALJ properly identified Listing 13.05 as the relevant listing and accurately

recited its criteria.  (Tr. 21-22).  Although the section of the ALJ's decision describing his

listings findings included only a conclusory statement that "[t]he claimant does not meet this

listing," the ALJ's decision – read as a whole – plainly shows that he relied upon Dr. Sklaroff's

testimony in finding that Galley's lymphoma did not meet the severity criteria of Listing 13.05,

paragraph A.[6]  (Tr. 21-22, 28); *see Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–89

(7th Cir. 2010) ("There is no requirement [that an ALJ package his analysis into a tidy

paragraph], however; we read the ALJ's decision as a whole and with common sense.").

Specifically, Dr. Sklaroff had testified that Galley did not meet Listing 13.05 because there was

---

[6] The ALJ did not need to consider the criteria for Listing 13.05 paragraphs B (Hodgkin Lymphoma), C
(bone marrow or stem cell transplantation), or D (mantel cell lymphoma) because no evidence in the
record indicated the presence of such cancers or transplantation.  *See McClellan v. Astrue*, 804 F. Supp.
2d 678, 682 (E.D. Tenn. Feb. 28, 2011s) (an ALJ need not consider a listing that the claimant would
obviously not meet or medically equal).

no evidence of relapse, a biopsy showed no evidence of disease activity after topical therapy, therapy appeared to keep him stable, and Galley's changes in therapy appeared to be motivated by undesired side effects rather than failure. (Tr. 28, 64-65, 74-77, 93). Thus, the ALJ's clear indication that he relied on Dr. Sklaroff's opinion testimony was sufficient to comply with the regulations and the requirement to provide a reasoned analysis. 20 C.F.R. pt. 404, Supt. P, App 1 § 13.05A; *Reynolds*, 424 F. App'x at 416.

Dr. Sklaroff's opinion testimony was also substantial evidence supporting the ALJ's finding that Galley did not have an impairment that met or medically equaled the severity criteria of Listing 13.05. *See* 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1154. Dr. Sklaroff's testimony that Galley's lymphoma appeared stable because there was no recurrent residual metastatic disease supported a finding that Galley did not have "persistent or recurrent" aggressive lymphoma after treatment under Listing 13.05(A)(1). 20 C.F.R. pt. 404, Supt. P, App 1 § 13.05A1; (Tr. 93-94). Likewise, Dr. Sklaroff's testimony (i) that Galley's treatments had been changed because of concerns over side-effects, (ii) that the lack of recurrent, residual, or metastatic disease suggested that the treatments were working, and (iii) that there was no evidence that Galley's treatments had failed supported the ALJ's finding that Galley had not initiated new treatment as a result of the failure of prior treatments, as required under Listing 13.05(A)(2). 20 C.F.R. pt. 404, Supt. P, App 1 § 13.05A2; (Tr. 76-77, 79, 93). And Dr. Sklaroff's opinion was based on his review of and consistent with other medical evidence in the record, including: (1) treatment notes indicating that the reasons for changing anticancer treatments were concerns "over extensive sun exposure," side effects, Galley's election of alternative treatment, and a clinical trial; (2) treatment notes indicating an overall 80% improvement since beginning anticancer treatment; (3) treatment notes indicating that Galley

20

achieved partial remission with UV light and methotrexate, "significant improvement" while on bexarotene, "some area of clearing in areas treated with hypericin," and "some improvement" with Targretin; (4) ophthalmological records regarding his pseudotumor cerebri treatment indicating that his CTCL was stable; (5) Dr. Hinzman's and Dr. Ugbana's finding that Galley did not meet Listing 13.05; and (6) Dr. Hinzman's observation that Galley's therapies restricted the spread of CTCL and that there was no advanced tumor formation.  (Tr. 67-73, 145-46, 172-76, 455, 457, 460-62, 468-69, 471-72, 474, 476, 478-79, 481, 482, 485-89, 495, 570-73, 575-76, 578-83, 585-86, 588, 590-91, 593, 595-99, 601, 605, 709, 713, 718, 760-62); *also* SSR 17-2p, 2017 SSR LEXIS 2, at *5; *Atterberry*, 871 F.2d at 570.

The court agrees that the record did not show that Galley ever achieved full remission. But failure to achieve remission is not the same as failure to achieve stability.  *Compare Stable D isease*, NAT'L CANCER INST. DICTIONARY OF CANCER TERMS, https://www.cancer.gov/publicati ons/dictionaries/cancer-terms/def/stable-disease (last visited March 29, 2021) ("Cancer that is nei ther decreasing nor increasing in extent or severity"), *with Remission*, NAT'L CANCER INST. DICT IONARY OF CANCER TERMS, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/r emission (last visited March 29, 2021  ("A decrease in or disappearance of signs and symptoms of cancer.").  And because substantial evidence supported the ALJ's finding that Galley did not have an impairment that met or medically equaled the severity criteria of Listing 13.05, the ALJ's weighing of the evidence cannot be second-guessed by this court even if a preponderance of the evidence might have supported a different conclusion.  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476-77.

Because the ALJ applied proper legal standards and his decision finding that Galley did not have an impairment that met or medically equaled the severity criteria of Listing 13.05 was

reasonably drawn from the record, the ALJ's decision fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, there is no basis to remand that portion of the ALJ's decision.[7]

## V.    Recommendation

Because the ALJ failed to apply proper legal standards by neglecting to include any explanation why Galley's skin impairment did not *medically equal* Listing 8.05 and that error was not harmless, I recommend that the Commissioner's final decision denying Galley's applications for DIB and SSI be VACATED and that Galley's case be REMANDED for further consideration.

Dated: March 29, 2021

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[7] As noted above in footnote 5, the issue of whether Galley meets or medically equals Listing 13.05 can be revisited upon remand, assuming Galley has updated evidence to submit.